IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF TEXAS
<u>HOUSTON DIVISION</u>

| | | |
|---|---|---|
| MARC ROVNER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) | C.A. No. |
| | ) | |
| vs. | ) ) | |
| BAKER HUGHES INCORPORATED, CLARENCE P. CAZALOT, JR., MARTIN S. CRAIGHEAD, LYNN L. ELSENHANS, ANTHONY G. FERNANDES, CLAIRE W. GARGALLI, PIERRE H. JUNGELS, JAMES A. LASH, J. LARRY NICHOLS, JAMES W. STEWART, CHARLES L. WATSON, GREGORY BRENNEMAN, WILLIAM H. EASTER III, HALLIBURTON COMPANY, and RED TIGER LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CLASS ACTION |
| Defendants. | ) ) | |

**CLASS ACTION COMPLAINT**

Plaintiff Marc Rovner ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged upon personal knowledge, as follows:

**NATURE OF THE ACTION**

1. This is a class action brought on behalf of the public stockholders of Baker Hughes Incorporated ("Baker Hughes" or the "Company") against Baker Hughes and its Board of Directors (the "Board" or the "Individual Defendants"), arising out of their breaches of fiduciary duty or the aiding and abetting of such breaches in connection with the Board's agreement to sell the Company to Halliburton Company ("Halliburton") and its wholly owned subsidiary Red Tiger LLC ("Merger Sub"). This action seeks to enjoin defendants from further breaching their fiduciary duties in their pursuit of a sale of the Company at an unfair price through an unfair and self-serving process to Halliburton (the "Proposed Transaction").

1

2.     The Proposed Transaction is the result of an unfair process and provides the Company's stockholders with inadequate consideration.  As a result of what appears to be a woefully deficient sales process, the Individual Defendants agreed to Baker Hughes stockholders receiving just 1.12 shares of Halliburton stock and $19.00 in cash for each share of Baker Hughes they own (the "Merger Consideration").  Based on the November 12, 2014 closing price of Halliburton, the day prior to the Company's public confirmation that it was in talks with Halliburton, Baker Hughes stockholders are receiving Merger Consideration valued at only $78.62 a share.

3.     Halliburton is the driving force behind the Proposed Transaction.  On October 13, 2014, Halliburton made an undisclosed unsolicited proposal to acquire the Company.  Then, on November 14, 2014, Baker Hughes announced its receipt of a notice from Halliburton that Halliburton intended to nominate candidates to replace the entire Board at the Company's April 2015 annual meeting.  As such, the Proposed Transaction stems not from the Board's concern for the best interests of its stockholders, but rather from the Board's desire to avoid a proxy contest and a potential ouster from their positions.  The Board has breached their fiduciary duties by capitulating to Halliburton and agreeing to the Proposed Transaction for the inadequate Merger Consideration.

4.     The inadequacy of the Merger Consideration is evidenced by the fact that: (i) at least two analyst set a price target for the Company above the Merger Consideration, with at least one analyst setting a price target of $92; (ii) the Merger Consideration is a mere 3.9% premium to the Company's 52-week high of $75.64, which Baker Hughes stock traded at as recently as July 2, 2014; and (iii) the Company has continued to perform well and is poised for growth, as further discussed below.

5.      In order to lock in the Proposed Transaction at the unfair Merger Consideration, the Board entered into numerous preclusive and onerous deal protection devices, as set forth in the Agreement and Plan of Merger (the "Merger Agreement") filed with the U.S. Securities and Exchange Commission ("SEC") on November 18, 2014.  These provisions, which further diminish the chances of obtaining maximum value for the Company's stockholders by collectively precluding any competing offers for the Company, include: (i) a strict no-solicitation provision that severely constrains the Individual Defendants' ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals; (ii) a four business day "matching rights" period; and (iii) a termination fee provision requiring the Company to pay $1 billion to Halliburton in the event the Company receives a higher offer and enters into an alternative transaction.  These unreasonable terms virtually foreclose the possibility that an alternative bidder will emerge to acquire the Company.  These provisions reflect an attempt by the Board to lock up the Proposed Transaction at a price that grossly undervalues the Company while simultaneously securing for themselves certain personal benefits not shared equally by Baker Hughes' public stockholders.  Specifically, while the Company's stockholders will lose control of Baker Hughes at an unfair price, in addition to the millions of dollars they will receive as a result of the accelerated vesting of unvested options and awards in connection with the Proposed Transaction, certain of the Individual Defendants have secured post-merger positions with the combined company

6.      As described below, both the value to Baker Hughes stockholders contemplated in the Proposed Transaction and the process by which defendants propose to consummate the Proposed Transaction are fundamentally unfair to Plaintiff and the other public stockholders of the Company.  The Individual Defendants' conduct constitutes a breach of their fiduciary duties owed

to Baker Hughes stockholders, and a violation of applicable legal standards governing the Individual Defendants' conduct.

7.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Individual Defendants' violations of their fiduciary duties.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  Plaintiff is a citizen of Florida and no defendant is a citizen of Florida.

9.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.     Venue is proper in this district because Baker Hughes maintains its principal place of business in this district.

## PARTIES

11.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Baker Hughes common stock.

12.     Defendant Baker Hughes is a publicly traded Delaware corporation headquartered in Houston, Texas.  Baker Hughes' principal executive offices are located at 2029 Allen Parkway, Houston, Texas 77019.  Its common stock is traded on the New York Stock Exchange under the symbol "BHI."

13.     Defendant Clarence P. Cazalot, Jr. ("Cazalot") has served as a Baker Hughes director since 2002.

4

14.     Defendant Martin S. Craighead ("Craighead") has served as a Chairman of the Board since April 2013 and as a Baker Hughes director since 2011.  Defendant Craighead has served as the Company's Chief Executive Officer ("CEO") since January 2012 and President since 2010.  He previously served as Baker Hughes' Chief Operating Officer from 2009 to 2012, the Group President of Drilling and Evaluation from 2007 to 2010, and Vice President of the Company from 2005 until 2009.

15.     Defendant Lynn L. Elsenhans ("Elsenhans") has served as a Baker Hughes director since 2012.

16.     Defendant Anthony G. Fernandes ("Fernandes") has served as a Baker Hughes director since 2001.

17.     Defendant Claire W. Gargalli ("Gargalli") has served as a Baker Hughes director since 1998.

18.     Defendant Pierre H. Jungels ("Jungels") has served as a Baker Hughes director since 2006.

19.     Defendant James A. Lash ("Lash") has served as a Baker Hughes director since 2002.

20.     Defendant J. Larry Nichols ("Nichols") has served as a Baker Hughes director since 2001.

21.     Defendant James W. Stewart ("Stewart") has served as a Baker Hughes director since 2010.

22.     Defendant Charles L. Watson ("Watson") has served as a Baker Hughes director since 1998.

23.     Defendant Gregory Brenneman ("Brenneman") has served as a Baker Hughes director since 2014.

24.     Defendant William H. Easter III ("Easter") has served as a Baker Hughes director since 2014.

25.     The defendants named in paragraphs thirteen through twenty-four are collectively referred to herein as the "Individual Defendants."

26.     Defendant Halliburton is a Delaware corporation with its headquarters located in Houston, Texas.  Its common stock is traded on the New York Stock Exchange under the symbol "HAL."

27.     Defendant Merger Sub is a Delaware limited liability company and a direct, wholly owned subsidiary of Halliburton.

## CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedures on behalf of all holders of Baker Hughes shares who are being and will be harmed by defendants' actions described below (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

29.     This action is properly maintainable as a class action.

30.     The Class is so numerous that joinder of all members is impracticable.  As of November 14, 2014, there were approximately 432,682,575 shares of Baker Hughes common stock outstanding, held by hundreds, if not thousands, of individuals and entities dispersed throughout the country.

31.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants breached their fiduciary duties owed to Plaintiff and the Class, or are aiding and abetting therein; and (ii) whether defendants will irreparably harm Plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

6

32.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

33.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

34.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

35.     Under Delaware law, in any situation where the directors of a publicly traded corporation undertake a transaction that will result in a sale or change in corporate control, they have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's stockholders, including a significant control premium. To diligently comply with these duties, neither the officers nor the directors may take any action that:

(a)     adversely affects the value provided to the corporation's stockholders;

(b)     will discourage, inhibit, or deter alternative offers to purchase control of the corporation or its assets;

7

(c)      contractually prohibits themselves from complying with their fiduciary duties;

(d)      will otherwise adversely affect their duty to secure the best value reasonably available under the circumstances for the corporation's stockholders; or

(e)      will provide the directors or officers with preferential treatment at the expense of, or separate from, the public stockholders.

36.      In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors, officers, or majority stockholders of Baker Hughes are obligated under Delaware law to refrain from:

(a)      participating in any transaction where the directors' or officers' loyalties are divided;

(b)      participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public stockholders of the corporation; or

(c)      unjustly enriching themselves at the expense or to the detriment of the public stockholders.

37.      The Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties and aiding and abetting such breaches, including their duties of loyalty, good faith, and independence owed to Plaintiff and other public stockholders of Baker Hughes. Certain of the Individual Defendants are obtaining for themselves personal benefits, including personal financial benefits, not shared equally by Plaintiff or the Class. Accordingly, the Proposed Transaction will benefit the Individual Defendants in significant ways not shared with the Class members. As a result of the Individual

Defendants' self-dealing and divided loyalties, neither Plaintiff nor the Class will receive adequate or fair value for their Baker Hughes common stock in the Proposed Transaction.

38.     Because the Individual Defendants are knowingly or recklessly breaching their fiduciary duties of loyalty, good faith, and independence in connection with the Proposed Transaction, the burden of proving the inherent or entire fairness of the Proposed Transaction, including all aspects of its negotiation, structure, price, and terms, is placed upon defendants as a matter of law.

### CONSPIRACY, AIDING AND ABBETTING, AND CONCERTED ACTION

39.     In committing the wrongful acts alleged herein, defendants have pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, defendants further aided and abetted or assisted each other in breach of their respective duties as herein alleged.

40.     Each defendant herein aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions as particularized herein, to substantially assist the commission of the wrongdoing complained of, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.  Defendants' acts of aiding and abetting, included the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

### SUBSTANTIVE ALLEGATIONS

***The Proposed Transaction***

41.     On November 17, 2014, Baker Hughes and Halliburton issued a joint press release announcing the Proposed Transaction.  The press release stated, in pertinent part:

**HOUSTON – November 17, 2014 -** Halliburton Company (NYSE: HAL) and Baker Hughes Incorporated (NYSE: BHI) today announced a definitive agreement under which Halliburton will acquire all the outstanding shares of Baker Hughes in a stock and cash transaction. The transaction is valued at $78.62 per Baker Hughes share, representing an equity value of $34.6 billion and enterprise value of $38.0 billion, based on Halliburton's closing price on November 12, 2014, the day prior to public confirmation by Baker Hughes that it was in talks with Halliburton regarding a transaction. Upon the completion of the transaction, Baker Hughes stockholders will own approximately 36 percent of the combined company. The agreement has been unanimously approved by both companies' Boards of Directors.

The transaction combines two highly complementary suites of products and services into a comprehensive offering to oil and natural gas customers. On a pro-forma basis the combined company had 2013 revenues of $51.8 billion, more than 136,000 employees and operations in more than 80 countries around the world.

\* \* \*

**Transaction Terms and Approvals**

Under the terms of the agreement, stockholders of Baker Hughes will receive, for each Baker Hughes share, a fixed exchange ratio of 1.12 Halliburton shares plus $19.00 in cash.

\* \* \*

**Headquarters, Management and Board of Directors**

The combined company will maintain the Halliburton name and continue to be traded on the New York Stock Exchange under the ticker symbol "HAL." The company will be headquartered in Houston, Texas.

Dave Lesar will continue as Chairman and Chief Executive Officer of the combined company. Following the completion of the transaction, the combined company's Board of Directors is expected to expand to 15 members, three of whom will come from the Board of Baker Hughes.

Concurrently with the execution of the merger agreement, Halliburton withdrew its slate of directors nominated for the Board of Directors of Baker Hughes.

***Company Background and its Bright Future***

42.     Baker Hughes is a leading supplier of oilfield services, products, technology and systems to the worldwide oil and natural gas industry.  The Company provides industrial products and services to the downstream chemicals, and process and pipeline industries.  Baker Hughes is

the third largest oilfield servicer with operations in more than 80 countries worldwide and as of December 31, 2013, the Company had approximately 59,400 employees, about 58 percent of which work outside of the United States.

43.     The Company's businesses include both its Oilfield Operations and its Industrial Services.  Baker Hughes' Oilfield Operations are managed through a geographic organization, which places management closer to customers, allowing the Company to react quickly to local market conditions and customer needs.  Baker Hughes' Oilfield Operations are organized through the following four geographic segments: North America (Houston, Texas, U.S.), Latin America (Houston, Texas, U.S.), Europe/Africa/Russia Caspian (London, England), and Middle East/Asia Pacific (Dubai, United Arab Emirates).  This geographic organization supports the Company's oilfield operations and is responsible for sales, field operations and well site execution.

44.     The Company's Oilfield Operations products and services are divided based on the two major phases of constructing an oil or natural gas well.  They are classified as either Drilling and Evaluation or Completion and Production.  The Company's Drilling and Evaluation products and services include: (i) Drill Bits; (ii) Drilling Services; (iii) Wireline Services; and (iv) Drilling and Completion Fluids.   It's Completion and Production products and services include: (i) Completion Systems; (ii) Wellbore Intervention; (iii) Intelligent Production Systems; (iv) Artificial Lift; (v) Upstream Chemicals; and (vi) Pressure Pumping.

45.     The Company's Industrial Services businesses are reported as its fifth segment. This segment includes Baker Hughes' downstream chemicals business and its process and pipeline services business.

46.     Baker Hughes derives the majority of its revenue from its North America segment. Specifically, for the year ended December 31, 2012, the Company reported revenue of $22,364 million broken down by segment as follows: (i) North America, $10,878 million; (ii) Latin

11

America, $2,307 million; (iii) Europe/Africa/Russia/Caspian, $3,850 million; (iv) Middle East/Asia Pacific $4,050 million; and (v) Industrial Services, $1,279 million.

47.     Underscoring the Company's positioning for long-term growth, on April 17, 2014, the Company issued a press release announcing its first quarter ("1Q") 2014 financial results, including revenue of $5.7 billion, a 10% increase from 1Q 2013 and adjusted net income of $0.84 per share, a 29% increase from 1Q 2013.  Defendant Craighead commented on the positive quarter, stating:

> This quarter we delivered an increase in profit margins and earnings . . . .  Our performance is the result of actions to optimize operational efficiency, along with increasing demand for several innovative new product offerings.
>
> The benefit of these actions can be seen in our North America operations this quarter. On an adjusted basis, this segment delivered 200 basis points of margin improvement, despite a drop in well count caused by poor weather in the Rockies and northeast United States. Outside of North America, our operations experienced the typical seasonal decline in product sales to start the year, along with severe weather conditions in the North Sea and Russia, leading to a 5% sequential drop in revenue for our international business. However, resumption of our activity in Iraq, along with increased demand for high technology services in Africa, the Middle East, and Asia Pacific, led to a 6% sequential increase in international adjusted operating profit.
>
> **Compared to the same quarter last year, our adjusted earnings per share have increased 29%.** Based on this positive performance, and our favorable outlook for our industry, we repurchased $200 million of our shares during the first quarter.
>
> **The demand for both innovative and integrated products and services has never been greater. We are continuing to redefine the technical limits for our customers in drilling efficiencies, production optimization, and ultimate recovery. These factors, along with our continued focus on operating efficiency, are driving profitable growth in the company, leading to an increase in our shareholders' returns.**

(Emphasis added).

48.     The Company's momentum continued into the second quarter ("2Q") of 2014.  On July 17, 2014, Baker Hughes reported its 2Q financial results, including revenue of $5.9 billion, an 8% increase from 2Q 2013, and adjusted profit before tax from operations of $778 million, a

15% increase from 1Q 2014.  In the Company's July 17, 2014 press release, Defendant Craighead stated:

> This quarter we delivered **record** revenue and a 15% sequential increase in adjusted profit from operations . . . .  Our results reflect improved execution and the rapid deployment of innovative new products and services around the world.
>
> In North America, newly introduced well construction and production technologies, such as the Kymera™ hybrid drill bit and ProductionWave™ production solution, are seeing **unprecedented demand** resulting in **record revenue** in our drilling services, drill bits, upstream chemicals, and artificial lift product lines. The rising sales of these products, along with an increase in onshore and offshore activity in the United States, more than offset the seasonal decline in our Canadian business.
>
> Internationally, we are leveraging new logging-while-drilling and wireline technologies to gain share within several critical offshore markets, including the United Kingdom, West Africa, and Australia. In the onshore markets, we are entering the early stages of global shale development. Products and services we recently introduced to improve the economics of North America shale production, are now finding new homes in the Middle East, Argentina, North Africa, Russia, and China.
>
> Around the world, the fundamentals of our business continue to strengthen. We anticipate increased activity for the remainder of the year in the form of higher international rig counts, and increased North American well counts. **As a result, we project strong earnings growth as we fulfill the industry's growing need for innovative new technologies.**

(Emphasis added).

49.     The positive news continued for stockholders.  On October 16, 2014, the Company reported its third quarter ("3Q") financial results, including record revenue of $6.25 billion, a 5% increase from 2Q 2014, record EBITDA of $1.12 billion, a 3% increase from 2Q 2014, and record free cash flow for the quarter of $725 million.  Defendant Craighead remarked:

> Our third quarter results included **record revenue, record free cash flow, and more than a 10% sequential increase in adjusted earnings**. We achieved these results despite several geopolitical events in the Eastern Hemisphere and a sharp reduction of activity in the Gulf of Mexico which caused margins to fall short of our expectations. Our outlook for the near term remains positive based on increasingly favorable market conditions in our North American business and recent actions to increase profitability internationally.

13

Latin America delivered increased revenue and margins primarily from Argentina and offshore Mexico. In the Eastern Hemisphere, protracted disruptions in Libya and Iraq, along with a sharp decline in the value of the Russian Ruble, contributed to reduced revenue and margins. In the quarter, we restructured our North African operations and completed the demobilization of a major contract in Iraq.

In North America, revenue growth was driven by a significant increase in service intensity in our pressure pumping product line and the seasonal rebound of our Canadian business. At the same time, activity delays our customers are experiencing in the Gulf of Mexico caused North American margins to remain unchanged.

For the fourth quarter, our North American segment is expected to deliver increased revenue and margins as activity levels return to normal in the Gulf of Mexico and profitability continues to improve in our pressure pumping business. Internationally, we project increased revenue and margins due to the seasonal uplift in year-end product sales along with recent contract wins in Latin America, and actions taken to improve efficiencies in the Eastern Hemisphere.

(Emphasis added).

### *The Proposed Transaction Undervalues the Company*

50.     Given the Company's strong financial performance, the Proposed Transaction fails to adequately compensate Baker Hughes' stockholders for the intrinsic value of the Company as well as the significant benefits Halliburton will receive from the merger. Rather than face an impending proxy battle and potential ouster by Halliburton, the Individual Defendants have capitulated to Halliburton and agreed to sell Baker Hughes for an inadequate price, depriving Baker Hughes stockholders of the true value of their investments in the Company.

51.     Highlighting the inadequacy of the Merger Consideration, prior to the announcement of the Proposed Transaction at least two analysts set a price target for the Company above the Merger Consideration. Specifically, Drexel Hamilton LLC set a $92.00 price target for Baker Hughes as recently as October 17, 2014, and RS Platou Markets AS set a $90 price target for the Company on July 3, 2014.

52.     Further, the Merger Consideration is a mere 3.9% premium to the Company's 52-week high of $75.64, which Baker Hughes stock traded at as recently as July 2, 2014.

14

53.    Defendants agreed to the Proposed Transaction in breach of their fiduciary duties. Rather than undertake a value-maximizing sale process, the Board sought to protect itself and capitulated to Halliburton.

54.    In addition, the Merger Consideration fails to adequately compensate Baker Hughes' stockholders for the significant synergies that Halliburton expects to reap from the Proposed Transaction.

55.    According to the November 17, 2014 press release announcing the Merger Agreement, the Proposed Transaction is expected to be accretive to Halliburton.  Specifically, in the press release Halliburton's CEO Dave Lesar ("Lesar") touted: "[w]e expect the combination to yield annual cost synergies of nearly $2 billion.  As such, we expect that the acquisition will be accretive to Halliburton's cash flow by the end of the first year after closing and to earnings per share by the end of the second year."  In the press release, Lesar further stated:

> Once integrated, the companies anticipate revenues of the combined business growing in the mid-teens and adjusted EBITDA margins approaching 20% in three to four years.
>
> The amount of cost synergies is expected to be in the range of $40 million to $45 million anticipated to be fully realized by the third year after completion of the transaction. Expense synergy opportunities include: public company expenses, overlapping support function and systems costs, as well as process and vendor consolidation opportunities across the business.
>
> Baker Hughes anticipates that the transaction will be accretive to the combined companies' adjusted EBITDA in the second full-year after completion of the transaction.

56.    Analysts have also noticed the significant benefits for Halliburton.  A November 14, 2014 Bloomberg article entitled "Halliburton, Baker Lie Low After Proxy Fight Threatened" noted with respect to a potential merger:

> Halliburton, the world's second-largest provider of oil-field services, would eliminate one of its chief rivals in the merger, expanding its business portfolio and market clout at a time when falling oil prices have plunged the industry into a

15

downturn.  The combination with No. 3 Baker Hughes would create a company a little more than half the size of Schlumberger Ltd.

57.     In addition, a November 17, 2014 Associated Press article entitled "Halliburton Pounces on Baker Hughes" stated:

> Baker Hughes has developed some key technology that would help Halliburton expand its offerings in U.S. shale plays. Baker Hughes created drill bits that can change direction underground, allowing drillers to stay in the most productive sections of rock. Baker Hughes also has developed sensors that allow drillers to understand what kind of rock they are encountering underground, and chemicals to help make the oil and gas flow more easily out of the well.
>
> Halliburton will also gain access to Baker Hughes technology that can extract oil from older oil fields. These fields no longer have enough subterranean pressure to push oil to the surface, so drillers must force it out using a process known broadly as "artificial lift."

58.     Indeed, on the November 17, 2014 joint conference call, following the announcement of the Proposed Transaction, Halliburton CEO Lesar stated:

> Clearly a couple of the product lines that Baker brings to us that are world class and are areas that we don't have as big a presence as we like would be artificial lift and in the production chemicals business.  And then you look at other overlaps and the technology that they have and the technology we have is very complementary to each other.

59.     As detailed above, the Merger Consideration is unfair and inadequate because, among other things, the intrinsic value of Baker Hughes materially exceeds the amount offered in the Proposed Transaction.  In addition, the Proposed Transaction deprives Class members of their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

***Company Insiders Will Reap Disproportionate Benefits from the Proposed Transaction***

60.     Because the Individual Defendants dominate and control the business and corporate affairs of Baker Hughes and have access to material, non-public information concerning Baker Hughes' financial condition and business prospects, there exists an imbalance and disparity of

knowledge and economic power between them and the public stockholders of Baker Hughes. Therefore, it is inherently unfair for the Individual Defendants to execute and pursue any merger or acquisition under which they will reap disproportionate benefits to the exclusion of obtaining the best stockholder value reasonably available.

61.     Here, however, defendants have disloyally placed their own interests first and tailored the terms of the Proposed Transaction so as to aggrandize their own positions. Accordingly, the Proposed Transaction will improperly benefit the defendants at the expense of Baker Hughes public stockholders' rights to receive the best consideration reasonably available for their Company shares.

62.     The Individual Defendants were motivated to engage in the Proposed Transaction for reasons that are not equally shared by Baker Hughes' public stockholders.  Facing a proxy battle and potential ouster by Halliburton at the Company's upcoming April 2015 Board meeting, capitulated to Halliburton by entering into the Proposed Transaction and securing post-merger positions for themselves with the combined company.  Specifically, according to the October 27, 2014 joint press release, "[f]ollowing the completion of the transaction, the combined company's Board of Directors is expected to expand to 15 members, three of whom will come from the Board of Baker Hughes."

63.     Moreover, as reflected in the Merger Agreement, the Individual Defendants and Company insiders will receive millions of dollars as a result of the accelerated vesting of unvested options and awards which will be cashed out in exchange for the Merger Consideration.

***The Unfair Deal Protection Devices***

64.     In addition to concerns regarding the inadequate Merger Consideration, the Merger Agreement features several provisions that work to preclude other bidders from stepping forward

17

with a superior alternative offer.  At best, these provisions place stockholders in an unfortunate position and, at worst, question the impartiality of the Board members in the negotiation process.

65.     First, the Merger Agreement includes a "no solicitation" provision, which impairs the ability of the Board to secure an offer that adequately captures the inherent value of the Company and adequately compensates Baker Hughes' stockholders for their ownership interest in the Company.  Specifically, Section 7.11(a) of the Merger Agreement prohibits the Board members and any Company personnel from soliciting, initiating, facilitating, or encouraging alternative proposals in an attempt to procure a price in excess of the Merger Consideration offered by Halliburton.  In conjunction with the matching rights and termination fee discussed below, the no solicitation provision will deter any potential buyers from making a competing bid.

66.     Section 7.11(b) of the Merger Agreement provides an "information rights" provision whereby the Company must notify Halliburton of any unsolicited competing bidder's offer promptly (and in any event within 24 hours).  Then, if and only if the Board members determine that the competing offer warrants a "Company Change in Recommendation," Section 7.11(c) grants Halliburton "matching rights," providing Halliburton four business days to amend the terms of the Merger Agreement so that the competing offer ceases to be a superior proposal.

67.     The foregoing provisions have the effect of ensuring that no other company will put forth a competing offer because their offer would be immediately communicated to Halliburton, giving Halliburton an informational advantage against any competing proposal as well as the ability to match any competing bid.

68.     Defendants have also agreed to a termination fee, which may require Baker Hughes to pay Halliburton $1 billion in the event that the Company decides to pursue another offer, thereby requiring that the alternate bidder agree to pay a naked premium for the right to provide Baker Hughes stockholders with a superior offer.

18

69.     Additionally, the Merger Agreement does not contain a "collar" guaranteeing Baker Hughes' stockholders a minimum dollar threshold for their shares.  Thus, they are at the mercy of the value of Halliburton stock at the time the Proposed Transaction is effectuated, which may be affected by numerous factors and therefore have little or no relationship to the value of their Baker Hughes stock at that time.  Should there be a major market shift in Halliburton stock, the Merger Consideration that Baker Hughes stockholders will receive for their Company stock will be even lower.  Indeed, following the announcement of the Proposed Transaction, Halliburton stock traded as low as $47.74 per share on November 19, 2014, representing a Merger Consideration of only $72.46.

70.     As a result of the defendants' conduct, Baker Hughes' public stockholders have been and will continue to be denied the fair process and arm's-length negotiated terms to which they are entitled in a sale of their Company.  The consideration reflected in the Merger Agreement does not reflect the true inherent value of the Company that was known only to the Individual Defendants, as directors of Baker Hughes, and defendant Halliburton at the time the Proposed Transaction was announced.

71.     In light of the foregoing, the Individual Defendants must, as their fiduciary obligations require:

- Withdraw their consent to the merger of Baker Hughes with defendant Halliburton and allow the shares to trade freely without impediments such as the aforementioned no-solicitation, matching rights, and termination fee provisions;

- Act independently so that the interests of Baker Hughes' public stockholders will be protected;

- Adequately ensure that no conflicts of interest exist between their own interests and their fiduciary obligation to maximize stockholder value or, if such conflicts exist,

to ensure that all conflicts be resolved in the best interests of Baker Hughes' public stockholders; and

- Solicit competing bids to defendant Halliburton's offer without the impediments discussed above to ensure that the Company's stockholders are receiving the maximum value for their shares.

72. As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Baker Hughes' assets and business and will be prevented from obtaining the intrinsic value of their equity ownership of the Company.

73. Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

74. Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law.

## FIRST CAUSE OF ACTION

### Claim for Breach of Fiduciary Duties
### Against the Individual Defendants

75. Plaintiff repeats and realleges each allegation set forth herein.

76. As members of the Company's Board, the Individual Defendants have fiduciary obligations to: (a) undertake an appropriate evaluation of Baker Hughes's net worth as a merger/acquisition candidate; (b) take all appropriate steps to enhance Baker Hughes's value and attractiveness as a merger/acquisition candidate; (c) act independently to protect the interests of the Company's public stockholders; (d) adequately ensure that no conflicts of interest exist between the Individual Defendants' own interests and their fiduciary obligations, and, if such conflicts exist,

to ensure that all conflicts are resolved in the best interests of Baker Hughes's public stockholders; (e) actively evaluate the Proposed Transaction and engage in a meaningful auction with third parties in an attempt to obtain the best value on any sale of Baker Hughes; and (f) disclose all material information to the Company's stockholders.

77.     The Individual Defendants have breached their fiduciary duties to Plaintiff and the Class.

78.     As alleged herein, the Individual Defendants initiated a sale process that undervalues the Company.  In addition, by agreeing to the Proposed Transaction, the Individual Defendants have capped the price of Baker Hughes stock from adequately reflecting the Company's true value.  The Individual Defendants also failed to sufficiently inform themselves of Baker Hughes's value, or disregarded the true value of the Company.  Furthermore, any third-party acquiror will now be discouraged from advancing a competing bid for the Company because of the onerous deal protection devices put in place and, significantly, because the Board is committed and has expressed its commitment to favor the Proposed Transaction.

79.     As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to Plaintiff and the other members of the Class.

80.     Plaintiff and the members of the Class have no adequate remedy at law.

### SECOND CAUSE OF ACTION

**Claim For Aiding and Abetting Breaches of Fiduciary Duty**
**Against Baker Hughes, Halliburton and Merger Sub**

81.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

82.     The Individual Defendants owed to Plaintiff and the members of the Class certain fiduciary duties as fully set out herein.

83.     By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to Plaintiff and the members of the Class.

84.     Defendants Baker Hughes, Halliburton and Merger Sub colluded in or aided and abetted the Individual Defendants' breach of fiduciary duties, and were active and knowing participants in the Individual Defendants' breach of fiduciary duties owed to Plaintiff and the members of the Class.

85.     Defendants Baker Hughes, Halliburton and Merger Sub participated in the breach of the fiduciary duties of the Individual Defendants for the purpose of advancing their own interests.  Defendants Baker Hughes, Halliburton and Merger Sub will obtain both direct and indirect benefits from colluding in or aiding and abetting the Individual Defendants' breaches. Defendants Baker Hughes, Halliburton and Merger Sub will benefit from the acquisition of the Company at an inadequate and unfair consideration if the Proposed Transaction is consummated.

86.     Plaintiff and the members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands relief in his favor and in favor of the Class and against defendants as follows:

A.     Declaring that this action is properly maintainable as a class action and certifying Plaintiff as Class representative;

B.     Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a merger agreement providing the best available terms for stockholders;

C.      Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction that is in the best interests of Baker Hughes' stockholders and to refrain from entering into any transaction until the process for the sale or merger of the Company is completed and the highest possible value is obtained;

D.      Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

Dated: November 26, 2014

/s/  William B. Federman
William B. Federman
TX Bar No. 00794935 / SDTX Bar No. 21540
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
405-235-1560
405-239-2112 facsimile

And

2926 Maple Avenue, Suite 200
Dallas, TX  75201
*Attorneys for Plaintiff*